IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05CR291-MHT |
| | ) | |
| BRUNO URIOSTEGUI | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This case is pending on the Motion to Suppress, filed by the defendant, BRUNO URIOSTEGUI ["Uriostegui"] on 18 January 2006 (Doc. # 11). The government responded to the motion on 26 January 2006 (Doc. # 16). Uriostegui seeks suppress of "all evidence and statements illegally seized as a result of the stop, search and seizure of [his] vehicle . . . . on December 5, 2005". Relying on ***Whren v. United States***, 517 U.S. 806 (1996), the United States contends that, because officers had probable cause to stop the vehicle, the subsequent warrantless search of the vehicle, under the circumstances of this case, was lawful.

Upon consideration of the motion, the response, and the evidence received at an evidentiary hearing conducted on 6 February 2006, the Magistrate Judge recommends that the motion be denied.

**I.   FACTS**

At approximately 3:00 a.m. on 5 December 2005, on Highway 431 in or near Dothan,

Alabama, Sgt. Andrew Ray Hughes ["Sgt. Hughes"][1] of the Dothan Police Department was on routine traffic patrol (TR. 3, 6). He described the lighting that morning as "very dark" (TR. 6).[2] He had stopped his vehicle along the highway when he observed Uriostegui's vehicle "cross the center line of the highway" as it traveled in the northbound lane (TR. 4). He began following the vehicle, a 1986 Toyota Supra, which crossed the center line "approximately three more times" during the pursuit. He also observed Uriostegui's vehicle "go into the far-fight-hand-portion of the right-hand-lane and cross over the fog line"[3] as well (TR. 4). There were no signals from the vehicle during this time (TR. 16).

Sgt. Hughes then initiated a traffic stop by activating his emergency lights (TR. 5). After Uriostegui stopped his vehicle, Sgt. Hughes approached the vehicle and told him that he was being stopped for "crossing the center line several times".[4] A female passenger was in the vehicle with the defendant (TR. 10). Uriostegui denied having any alcoholic beverage, and Sgt. Hughes detected "no odor of an alcoholic beverage on his breath (TR. 5). He told

---

[1] Sgt. Hughes had been a police officer for 16 years and a sergeant with the DPD for 11 years (TR. 16-17).

[2] When he stopped Uriostegui's vehicle, Sgt. Hughes could not see inside, and he had no information about the driver or the passenger (TR. 13).

[3] The "fog line" is the solid white line running along the right side of the highway (TR. 4-5).

[4] Sgt. Hughes was relying upon §32-5A-88, Code of Alabama, 1975, which requires in pertinent part, that "a vehicle . . . be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety". The government offered the statute into evidence; the court declined to "admit" it, but took judicial notice of its enactment and applicability to travel on Alabama roadways.

Sgt. Hughes that he was coming from Panama City, Florida, and produced a Georgia driver's license (TR. 6).

Sgt. Hughes contacted the DPD to determine if the license was current and valid, and in the meantime, he also contacted "the Blue Lightning Operations Center", known as "BLOC" (TR. 8). Sgt. Hughes had received BLOC training in 1996, designed, inter alia, to assist law enforcement officers "[i]n conducting traffic stops" (TR. 18). The training is provided to officers by Immigration and Customs Enforcement in the Department of Homeland Security (TR. 18), but it was not "immigration-relation . . . . [rather] it was related to contraband interdiction" (TR. 19). [5]

Sgt. Hughes learned from the DP that the tag on the vehicle was not registered to Uriostegui, and the defendant did not have registration documents in the vehicle (TR. 28). When the DPD advised him that Uriostegui's license "was cancelled in the State of Georgia in May of 2002",[6] Sgt. Hughes began completing a traffic citation for "driving while cancelled" (TR. 8).[7]

Shortly thereafter, he received information from BLOC that Uriostegui "was possibly wanted for an immigration violation" and that he had previously been deported from the

---

[5]Uriostegui did not engage in any behavior consistent with involvement with narcotics (TR. 26).

[6]The female passenger did not have a driver's license either (TR. 10).

[7]Government's Exhibit 1, a copy of the warning citation issued to Uriostegui for improper lane usage, was admitted into evidence at the hearing (TR. 9). Government's Exhibit 2, the citation for driving while cancelled, was admitted as well TR. 9).

United States (TR. 10). After speaking to an agent at Immigration and Customs Enforcement in Montgomery, Sgt. Hughes took the defendant into custody and directed an officer to transport him to the Dothan city jail while he remained at the scene (TR. 12).

The defendant's vehicle was towed, and Sgt. Hughes returned to the DPD, where a government detainer for the defendant awaited him.

## II.    DISCUSSION

Uriostegui argues that Sgt. Hughes lacked probable cause to stop his vehicle and that, for that reason, the stop, the search of the vehicle, the seizure of all items, and all statements made by the defendant should be suppressed.

At the close of the evidentiary hearing, Uriostegui's counsel stated:

> [I]f the Court believes that the officer stopped the vehicle for traffic violations, I believe that the strength of my arguments regarding my Motion to Suppress is weakened.

(TR. 32). Ordinarily this statement would be significant to the court's analysis. In the instant case, it is *critical* because there was absolutely no mention of a search, a seizure of an item from the vehicle, or Uriostegui's statements in his motion to suppress, the government's response, or in the testimonial or documentary evidence! At first glance, therefore, inasmuch as the defendant has presented no evidence of anything to suppress, the motion should be summarily denied.

It is, however, important to determine whether Sgt. Hughes had probable cause to stop Uriostegui's vehicle, as a prelude to the only possible behavioral target of the suppression

4

motion: *the seizure of Uriostegui himself*.  That task poses two discrete issues:

- Did Sgt. Hughes have probable cause to stop Uriostegui's vehicle?
- If so, does it matter whether he was primarily motivated by a desire to enforce the traffic laws?

The court concludes that he did and it doesn't.

A.   ***Probable Cause to Effect Traffic Stop***

Unquestionably, the Fourth Amendment protects persons against unreasonable searches and seizures, **Wilson v. Arkansas**, 514 U.S. 927, 980 (1995).[8]  The typical context of the application of this principle to vehicular stops is a subsequent search of the vehicle and seizure of contraband.  Thus, it is well-established that an officer can conduct a warrantless search or seizure of a vehicle if there exists probable cause to believe that the vehicle contains contraband or other evidence which is subject to seizure under the law and there exist exigent circumstances which necessitate a search or seizure. ***United States v. Alexander***, 835 F.2d 1406, 1409 (11th Cir. 1988).

Further, probable cause to search or seize exists "when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband."

---

[8]The Fourth Amendment's protections extend to "brief investigatory stops of persons or vehicles." **United States v. Arvizu**, 534 U.S. 266, 273 (2002).  For brief investigatory stops, the Fourth Amendment is satisfied if the police officer has a "reasonable suspicion" to believe that criminal activity "may be afoot." **Whren v. United States**, 517 U.S. 806, 810 (1996) (*citing Terry v. Ohio]*, 392 U.S. 1, 20 (1968).

*Id*., quoting *United States v. Clark*, 559 F.2d 420, 424 (5th Cir.), *cert. denied*, 434 U.S. 969, 98 S. Ct. 516, 54 L. Ed. 2d 457 (1977). *See also United States v. Nixon*, 918 F.2d 895 (11th Cir. 1990).

Often, an officer's stop of a vehicle is not motivated by reasonable suspicion that the vehicle contains contraband, but instead by the driver's commission of a traffic offense. In that instance, not only may "[a]n officer may conduct a brief investigative stop of a vehicle, analogous to a Terry-stop, if the seizure is justified by specific articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct.*"* *United States v. Strickland*, 902 F.2d 937, 939 (11th Cir. 1990).

> Alternatively, a police officer may stop a vehicle '[w]hen there is probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations' relating to the operation of the motor vehicle.

*Id*. (citations omitted); *see also United States v. Skinner*, 957 F. Supp. 228, 231 (M.D. Ga. 1997)(setting out these "[t]wo possible justifications for stopping an automobile.").

In Alabama, whenever a driver is traveling along a roadway that "had been divided into two or more clearly marked lanes for traffic", the motorist must drive "as nearly as practicable entirely within a single lane". Moreover, he may not change lanes "until [he] has first ascertained that such movement can be made with safety". §32-5A-88, *Code of Alabama*, 1975. In this case, Sgt. Hughes observed Uriostegui's vehicle crossing the center line - from one lane to another - at least three times, and he also observed the vehicle cross the fog line. The court therefore finds that the officer reasonable cause to believe that

Uriostegui was committing the traffic violation of improper lane usage.

Under these circumstances, Sgt. Hughes, and therefore the government, need not show that the seizure was justified by specific articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct. The court concludes that the vehicle stop at issue was not unreasonable under the circumstances and, therefore, did not violate the Fourth Amendment. *See* **Whren v. United States**, 517 U.S. 806, 810 (1996).

### B.    *The Impact of Sgt. Hughes' Motivation*

It is important to note that there is no evidence anywhere in the record that Sgt. Hughes was motivated by any factor other than the defendant's commission of a traffic offense when he stopped Uriostegui. That void alone vitiates the defendant's argument and, frankly, renders unnecessary any further analysis.[9] Indeed, the defendant admits that a finding of probable cause to stop his vehicle "weakens" his argument, but he apparently persists in his argument that, notwithstanding a demonstration of probable cause to make a traffic stop, Sgt. Hughes still exceeded his authority - and the bounds of the Fourth Amendment - by communicating with BLOC. That argument is made even though the defendant tendered a cancelled driver's license, had no registration documents, and was driving a vehicle not registered to him or his passenger.

---

[9] While the court applies the Supreme Court's finding that motivation is irrelevant if there is probable cause to stop the vehicle, in the absence of even a scintilla of evidence of motivation, the court's expenditure of resources, including its time, to affirm that finding in this case is questionable.

However, the Supreme Court has clarified an officer's right and duty, once the traffic stop is made, to question other questionable circumstances.

> Where the initial traffic stop is legal, the officer has "the duty to investigate suspicious circumstances that then [come] to his attention." *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991) (citation omitted). Moreover, during a legal stop, an officer may ask questions, including questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license. *United States v. Hernandez*, 418 F.3d 1206, n.3 (11th Cir. 2005).

*United States v. Ffriend*, No. 05-11499, 2005 WL 2293462, 2005 U.S. LEXIS 20308, at *2-4 (11th Cir. Sept. 21, 2005). *See, e.g., **United States v. Simmons**, 172 F.3d 775, 778 (11th Cir. 1999) ("Once the police had validly detained Simmons, plainly they were entitled under the decisional law to conduct a variety of checks on the driver and his car, including questioning the driver about the traffic violation, *requesting consent to search the car*, and running a computer check for outstanding warrants.") (*emphasis added*); **Ohio v. Robinette**, 519 U.S. 33, 35-36 (1996) (discussing, *inter alia*, an officer's request for consent to search during a traffic stop); **United States v. Hardy**, 855 F.2d 763, 755 (11th Cir. 1988).

Both parties place substantial reliance upon **Whren v. United States, supra**. However, only the government's reliance is well-placed. In **Whren**, Washington, DC police officers became suspicious when they passed a "dark Pathfinder truck with temporary license plates and youthful occupants waiting at a stop sign, the driver looking down into the lap of the passenger at his right". 517 U.S. at 808. When the officers began to pursue the vehicle, it turned right without signaling and sped off at an unreasonable speed. The vehicle soon

stopped at another traffic light, and as soon as the officers pulled alongside, he observed what he believed to be crack cocaine in Whren's (the driver's) hands.

The defendants argued that the stop was not motivated by the officers' reasonable belief that the occupants were engaged in illegal drug activity and that the traffic stop was pretextual.. The Supreme Court first noted its previous holding that a traffic violation arrest is not rendered invalid by the fact that it was "a mere pretext for a narcotics search". ***United States v. Robinson***, 414 U.S. 218, 221, n. 1 (1973). *See also **Gustafson v. Florida***, 414 U.S. 260, 266 (1973). The court thus held that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis". 517 U.S. at 813.

That holding applies fully in this case, and thus Sgt. Hughes' seizure of Uriostegui based on the information from BLOC survives Fourth Amendment scrutiny.

### III.   CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that Uriostegui's Motion to Suppress Stop, Search and Seizure be DENIED. It is further

**ORDERED** that the parties shall file any objections to the said Recommendation not later than **27 February 2006.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*)(adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 14th day of February, 2006.


/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE