IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION NO. |
| | ) | 1:05cr291-MHT |
| **BRUNO URIOSTEGUI** | ) | (WO) |

OPINION

Defendant Bruno Uriostegui is charged with illegal re-entry into the United States in violation of 8 U.S.C. 1326(a). Uriostegui has moved to suppress all evidence and statements seized as a result of the traffic stop during which he was taken into custody for a possible immigration violation. United States Magistrate Judge Vanzetta Penn McPherson held an evidentiary hearing on the motion on February 6, 2006, and recommends that the motion be denied. No objection has been filed to this recommendation. After an independent and de novo review of the record and for the reasons given below, the court will adopt Judge McPherson's recommendation.

## I. Background

At approximately 3:00 a.m. on December 5, 2005, Sgt. Andrew Ray Hughes of the Dothan Police Department was parked in the median of Highway 431 near Dothan, Alabama as part of a routine traffic patrol. Hughes testified, during the evidentiary hearing, that he observed a vehicle cross the center line of the highway as it traveled in the northbound lane and that it was too dark for him to see who was driving that vehicle. Hughes began following the vehicle and testified that it crossed the center line "approximately three more times" and that the vehicle also crossed the fog-line on the right margin of the highway.

Officer Hughes initiated a traffic stop, procured the license of the driver, Uriostegui, and submitted the information on the license to the Dothan Police Department (to determine its validity) and, simultaneously, to the U.S. Department of Homeland Security's ("DHS") Blue Lightning Operations Center.

Hughes had previously received "Blue Lightning" training in contraband interdiction conducted by DHS.

Information from the Dothan Police Department's communications center revealed that Uriostegui's license had expired, for which Hughes issued a citation. Hughes also issued a warning ticket for "erratic driving." Shortly thereafter, information received from Blue Lightning Operations Center revealed that Uriostegui was possibly wanted for an immigration violation. Hughes contacted an Immigration and Customs Enforcement agent and, while not "arresting" Uriostegui, took him into "custody" for further questioning. Hughes testified that he did not suspect Uriostegui of being under the influence or of any other violation of the law. While Uriostegui was in "custody," the government issued a detainer for him to the Dothan Police Department.

II. Discussion

Uriostegui's motion to suppress is based on the theory that he had violated no traffic laws, that is, that Hughes had no probable cause to effect the original stop. Uriostegui's implicit argument is that he was impermissibly stopped because of his Hispanic ethnicity for the purpose of determining his immigration status, although Hughes was not deputized to enforce federal immigration law. However, Hughes testified that he could not see the driver of the vehicle before the stop and that he did see the vehicle cross the center lane of the highway. Section 32-5A-88(1) of the 1975 Alabama Code provides that, "A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."

The magistrate judge found that Officer Hughes, based on his uncontested testimony, had reasonable cause to believe that Uriostegui was committing the traffic

4

violation of improper lane usage.  Once this finding has been made, the traffic stop must be considered valid even if evidence suggests that the stated reason for the stop was pretextual.  "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Whren v. United States, 517 U.S. 806, 813 (1996). Uriostegui's counsel, who does not object to the magistrate judge's recommendation, apparently recognizes that Whren compels this result.

However, although it cannot affect the outcome here, the court must disagree with the magistrate judge's finding that "there is no evidence anywhere in the record that Sgt. Hughes was motivated by any factor other than the defendant's commission of a traffic offense when he stopped Uriostegui."  Recommendation of the Magistrate Judge (Doc. No. 19), p. 7.  The extremely minor nature of the alleged traffic violation (by Hughes's own testimony, he began to give pursuit after seeing the vehicle cross a traffic lane line once), the fact that Hughes submitted

5

Uriostegui's information to a DHS database even before learning that his driver's license was expired, and the fact that Hughes did so despite having no suspicion of misconduct involving contraband (the only area in which he had received training from DHS), are all factors that in other circumstances might at least raise the question of whether Hughes was impermissibly motivated in his actions by Uriostegui's ethnicity.

Whren is clear in its instruction that an ulterior motive cannot strip an officer of a legal justification for such a traffic stop, and the facts of this case require its application. However, these facts also adumbrate a different scenario in which an officer's suspicion (of, for example, undocumented immigration status) is raised solely as a result of a driver's ethnicity or race, divorced from any other behavior. Because the body of traffic regulations "is so large and so difficult to obey perfectly that virtually everyone is guilty of violation," Whren, 517 U.S. at 817, it is

6

unfortunately conceivable that a driver whose ethnicity itself is the cause of suspicion could be followed, as Uriostegui was, until he commits a violation.  At such time, a police officer might conduct a stop to check the driver's license and registration without running afoul of <u>Delaware v. Prouse</u>, 440 U.S. 648 (1979), which disallowed random stops for such purposes.

In this scenario, an expansive reading of <u>Whren</u> could enlist the judiciary as an accomplice (albeit sometimes an unknowing one) to race or ethnicity-based police actions, by foreclosing even a detailed look, in a criminal case, into whether invidious race or ethic discrimination played a role in police conduct.  This result would pose a serious challenge to our nation's claimed commitment to a blind, non-racial criminal justice system, and may require a revisiting of the idea that "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in

certain circumstances, <u>whatever</u> the subjective intent." <u>Whren</u>, 517 U.S. at 814 (emphasis in original).

The court, while applying <u>Whren</u>'s holding to the instant case and while not necessarily convinced on the current factual development that race or ethnicity played a role in Officer Hughes's actions, has added these comments so that, if in the future, there should be occasion for the Supreme Court to reconsider <u>Whren</u> under circumstances similar to, if not even more compelling than, the ones outlined above, the facts of this case and this court's concern about <u>Whren</u>'s application to those facts will be known.

### III. Conclusion

For the reasons given above, Judge McPherson's recommendation will be adopted.

An appropriate order will be entered.

DONE, this the 20th day of March, 2006.

                         /s/ Myron H. Thompson
                         **UNITED STATES DISTRICT JUDGE**